MEMORANDUM & ORDER
 

 KATZ, Senior District Judge.
 

 Plaintiff Henry Ortlieb brings this action against Defendant Jefferson Bank and its successor, Defendant Hudson United Bank (collectively, the “Bank”) for their alleged failure to enter satisfaction of three mortgages given to Defendant on two of Plaintiffs real property holdings-one located in Pennsylvania and the other in New Jersey. As such, Plaintiff brings claims under both the Pennsylvania Mortgage Satisfaction statute, 21 P.S. §§ 681-682, and the New Jersey common law for slander of title. Now before this court are the Plaintiffs Motion for Partial Summary Judgment, Plaintiffs Supplemental Motion for Summary Judgment, and Defendant Hudson United Bank’s Motion for Summary Judgment.
 
 [1]
 
 Because Plaintiffs claims are barred by both the doctrine of judicial estoppel and the applicable statutes of limitations, the Defendant’s Motion is granted and the Plaintiffs’ denied.
 

 I. BACKGROUND
 

 On April 29, 1999, Plaintiff borrowed $550,000 from Jefferson Bank. As security for this loan, Plaintiff took out two $550,000 mortgages — one on his property in Fort Washington, Pennsylvania, and the other on his ocean-front house in Ocean City, New Jersey. Approximately one year later, on May 15, 2000, Plaintiff borrowed another $40,000, this time from Hudson United Bank, which had acquired Jefferson in the interim. As security for this second loan, Plaintiff gave Hudson United a $40,000 mortgage on the Ocean City, New Jersey house. By September 28, 2000, Plaintiff had repaid both loans in full.
 

 For the next two months, his obligations with respect to Defendant having been fulfilled, Plaintiff took steps to ensure that the Bank complied with its statutory duty to enter satisfaction of the repaid mortgages. First, some time in October, 2000, within a few weeks of repayment, Plaintiff spoke with Thomas Kelly, one of Hudson United’s officers, and requested that Mr. Kelly provide satisfactions of the mortgages on both the Pennsylvania and New Jersey properties. The Bank failed to comply with these requests. Then, on November 28, 2000, Plaintiffs attorney at the time, Warren Trainor, wrote to Robert Seiger, the Bank’s counsel in connection with the prior loans to Plaintiff, to inquire into whether the Pennsylvania mortgage had been satisfied. The November 28 letter marked the last time that Plaintiff, or any of his representatives, contacted the Bank regarding satisfactions until 2002.
 

 Plaintiffs first contact with Defendant in 2002 came on January 22, when Maxine Werbit, identifying herself as employed by a title insurance company, left a voice-mail
 
 *DCCL
 
 on behalf of Plaintiff for Rose Diaz, Defendant’s Vice President of Loan Operations, requesting satisfaction of Plaintiffs New Jersey and Pennsylvania mortgages. A few weeks later, the Bank received a letter dated February 18, 2002 from Plaintiffs new attorney, Dennis Nolan. Therein, Mr. Nolan cited the Pennsylvania Mortgage Satisfaction statute, 21 P.S. § 682, and threatened to sue Defendant if it did not prepare a satisfaction piece for the Pennsylvania mortgage and send it to him within ten days. A copy of this letter was furnished to Plaintiff, who also received oral confirmation from Mr. Nolan that the attorney had indeed threatened litigation against the Bank.
 

 In response to the February 18 letter, Barbara Montgomery, a file room employee at Hudson United, called Mr. Nolan’s office to request the title information necessary to prepare the satisfaction; the attorney’s office faxed the requested information to the Bank on February 27. Upon receiving this information, Hudson United promptly prepared and executed a release of the Pennsylvania mortgage, which it sent via Federal Express to Mr. Nolan’s office on March 1. The delivery arrived at Mr. Nolan’s office on March 4 and was signed for there by Theresa Mar-cone, Mr. Nolan’s secretary.
 

 Approximately two months later, on or about April 30, 2002, Mr. Nolan’s office called Defendant to inquire into satisfaction of Plaintiffs mortgages on the New Jersey property. On May 4, the Bank received a fax on Mr. Nolan’s stationary containing the title information regarding the $550,000 mortgage on the New Jersey house. As requested, the Bank then prepared and executed a release for that mortgage, which it mailed to Mr. Nolan’s office on May 7.
 

 On May 28, 2002, Mr. Nolan passed away and was replaced as Plaintiffs counsel by Frank Marcone. Although Mr. Marcone made diligent efforts to recover the Ortlieb files, he was unable to do so. He did, however, discover that — despite the Bank’s having executed and sent to Mr. Nolan the releases for both the Pennsylvania mortgage and the $550,000 New Jersey mortgage — neither release was ever filed by Plaintiff or any of his representatives. As such, a title company requested confirmation of satisfaction of the Pennsylvania mortgage on August 1, 2002, while Mr. Marcone himself requested a satisfaction piece for both New Jersey mortgages on September 27, 2002. Defendant complied with those requests on August 6 and October 1, respectively, and, thereafter, Mr. Marcone filed the satisfaction pieces with the appropriate authorities.
 

 Before filing his Complaint in this court on July 18, 2003-some time between July 2002 and January 2003 — Plaintiff contacted Kirk Wycoff, a banking executive with Progress Bank, in an attempt to again use his properties as collateral in order to obtain personal financing. Mr. Wycoff, however, told Plaintiff that he could do nothing for him as long as the Hudson United mortgages were not marked as satisfied. In addition, he explained to Plaintiff that, based on Mr. Wycoffs personal experience at Progress, he believed that Plaintiff might have a cause of action against Hudson United for the Bank’s failure to satisfy the three mortgages in a timely manner.
 

 Although Plaintiff had satisfied his obligations to Hudson United by September 28, 2000, he remained indebted to other creditors throughout the course of his dealings with Defendant. In particular, Washington Mutual, which owned mortgages totaling in excess of $1 million on both the Pennsylvania and New Jersey properties, were pursuing foreclosures against both properties. Plaintiff also
 
 *DCCLI
 
 owed $250,000 to DSB, LLC, which had purchased the second lien position on the Pennsylvania property. In addition, Plaintiff owed $156,000 to GE Capital, and he had over $100,000 in unpaid state and federal taxes.
 

 As a result of these debts, Plaintiff filed personal bankruptcy petitions with this court’s bankruptcy division on April 24, 2001, September 21, 2001, November 16, 2001, February 26, 2002, and April 24, 2003. In three of those five proceedings— the first, fourth, and fifth — Plaintiff filed the requisite schedules listing his assets but declined to mention his possible claim against Defendant in the instant litigation.
 
 [2]
 

 Throughout the ongoing bankruptcy process, attorneys for Plaintiff attempted to settle his debts on the grounds that he could not afford to pay his creditors the amounts he owed in full. For example, on February 27, 2002, Mr. Nolan wrote to counsel for DSB and offered to settle Plaintiff’s $250,000 debt for $125,000. He explained that the first lien holder on the Pennsylvania property was pursuing foreclosure and that, unless a proposed sale of the house to Mr. Ortlieb’s wife financed by a mortgage in her name was approved, there would be no alternative other than to go through Chapter 11 and abandon the property. In addition, on September 18, 2002, Mr. Marcone faxed to counsel for Washington Mutual a letter containing an offer to settle Plaintiffs debt with that institution. Therein, Mr. Marcone explained that Plaintiff could not afford to pay the amount due because he was indebted to a host of additional creditors. The attorney went on to list Plaintiffs creditors and the amount owed to each, including a $550,000 debt to Jefferson Bank. Plaintiff, however, had paid off his debt to the Bank in full on September 28, 2000.
 

 II. DISCUSSION
 

 This court finds that summary judgment must be granted in favor of Defendant because Plaintiffs claims are barred by the equitable doctrine of judicial estoppel. Even absent judicial estoppel, all of Plaintiffs claims based on the Pennsylvania mortgage are either untimely or fail as a matter of law, while his claims based on the New Jersey mortgages are likewise time-barred.
 

 A. Summary Judgment Standard
 

 Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party.
 
 Id.
 
 at 256, 106 S.Ct. 2505.
 

 The moving party has the burden of showing there are no genuine issues of material fact.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 Mathews v. Lancaster Gen. Hosp.,
 
 87 F.3d 624, 639 (3d Cir.1996). In response, the non-moving party must adduce more than a mere scintilla of evi
 
 *DCCLII
 
 dence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings.
 
 Anderson,
 
 477 U.S. at 249, 106 S.Ct. 2505;
 
 Celotex,
 
 477 U.S. at 325, 106 S.Ct. 2548;
 
 Williams v. Borough of West Chester,
 
 891 F.2d 458, 460 (3d Cir.1989). Rather, there must be evidence on which a jury could reasonably find for the nonmovant.
 
 Liberty Lobby,
 
 477 U.S. at 252, 106 S.Ct. 2505. “Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.”
 
 Celotex,
 
 477 U.S. at 322, 106 S.Ct. 2548.
 

 B. Judicial Estoppel
 

 Defendant’s primary contention is that judicial estoppel acts as a bar to Plaintiffs claims because he knowingly and misleadingly failed to disclose the existence of those claims on the bankruptcy schedules he filed with this court’s bankruptcy division between 2001 and 2003. This court agrees. The circumstances surrounding Plaintiffs knowing, bad faith failure to disclose his contingent claims against the Bank throughout the bankruptcy process, coupled with his subsequent pursuit of those claims in this court, meets the Third Circuit’s test for application of this equitable doctrine.
 

 First articulated by this Circuit in 1953, the judge-made doctrine of judicial estoppel polices a litigant’s use of the judicial system insofar as “a plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention.”
 
 Scarano v. Cent. R.R. Co. of New Jersey,
 
 203 F.2d 510, 513 (3d Cir.1953). Thus, the doctrine’s basic principle is that absent a sufficient explanation, a party should be prohibited from gaming an advantage by litigating on one theory and then subsequently seeking an additional advantage by pursuing an irreconcilably inconsistent theory.
 
 Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
 
 81 F.3d 355, 358 (3d Cir.1996).
 

 Although seemingly broad, judicial estoppel is not intended to eliminate any slight or inadvertent inconsistency in a litigant’s position; instead it is to be reserved for only the most egregious cases to prevent a party from deliberately “playing fast and loose with the courts.”
 
 Krystal Cadillac-Oldsmobile CMC Truck, Inc. v. Gen. Motors Corp.,
 
 337 F.3d 314, 319 (3d Cir.2003) (quoting
 
 Scarano,
 
 203 F.2d at 513). Still, however, the Court of Appeals has recently opined that “the fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate.”
 
 Krystal,
 
 337 F.3d at 325.
 

 Indeed, courts in this Circuit have found it appropriate to apply the doctrine to bar claims brought by litigants who had previously acted in bad faith in concealing those claims during prior bankruptcy proceedings.
 
 See, e.g., Krystal,
 
 337 F.3d at 319-25 (applying judicial estoppel to bar debtor plaintiffs claim against defendant creditor for violation of the automatic stay imposed by the Bankruptcy Code because plaintiff knew about the claim during the prior bankruptcy proceeding and had a motive to conceal it in the face of an affirmative duty to disclose);
 
 Oneida Motor Freight, Inc. v. United Jersey Bank,
 
 848 F.2d 414, 419-420 (3d Cir.1988) (invoking judicial es-toppel against debtor plaintiff to bar claims for breach of contract, breach of the duty of good faith, and fraudulent misrepresentation against defendant creditor because plaintiff failed to disclose those claims in bankruptcy proceedings despite
 
 *DCCLIII
 
 citing defendant’s improper activities as the catalyst for its bankruptcy filing);
 
 In re Okan’s Foods, Inc.,
 
 217 B.R. 739, 754-56 (Bankr.E.D.Pa.1998) (barring plaintiffs civil rights claim against defendant because plaintiff represented the contingent claim to the bankruptcy court as having little value and later filed a claim for $750,000, an amount that would have satisfied all of plaintiffs outstanding debts).
 
 But see Ryan,
 
 81 F.3d at 362-65 (rejecting application of judicial estoppel based on lack of evidence of plaintiffs bad faith in failing to disclose contingent claims in pri- or bankruptcy proceeding).
 

 In determining when to apply judicial estoppel to bar a seemingly inconsistent litigation stance, this court must consider (1) whether the party to be estopped has taken two positions that are “irreconcilably inconsistent;” (2) whether the change of position was in “bad faith” or was coupled with the intent of playing “fast and loose” with the court; and (3) whether the application of the doctrine is “tailored to address the harm identified” and “no lesser sanction would adequately remedy the damage done by the litigant’s misconduct.”
 
 Krystal,
 
 337 F.3d at 319-320 (quoting
 
 Montrose Med. Group Participating Sav. Plan v. Bulger,
 
 243 F.3d 773, 779-80 (3d Cir.2001)).
 

 1. Plaintiff’s Inconsistent Positions
 

 In order to apply judicial estop-pel to bar Plaintiffs claims, this court must first find that he is currently asserting a position that is “irreconcilably inconsistent” with one he asserted in a prior proceeding.
 
 Montrose,
 
 243 F.3d at 777. It is not required that the litigant arguing in favor of estoppel was a party to the prior proceeding nor that he or she was in privity with a party to that proceeding.
 
 Ryan,
 
 81 F.3d at 360-61 (“Where the contentions are mutually exclusive, it is irrelevant that they are asserted against diverse parties ... The integrity of the court is affronted by the inconsistency notwithstanding the lack of identity of those against whom it is asserted.”). All that is necessary to meet this first prong is that the party to be estopped asserted an inconsistent position in a previous proceeding and cannot credibly reconcile his or her changed stance.
 
 See, e.g., Montrose,
 
 243 F.3d at 781 (inconsistency element was satisfied because, among other inconsistencies, plaintiff repeatedly denied that a retirement plan was covered by ERISA in an earlier action but later filed an action based on the premise that the same plan was indeed covered by ERISA).
 

 Plaintiff filed this action for violation of the Pennsylvania Mortgage Satisfaction statute against Defendant on July 18, 2003, yet it is undisputed that he failed to disclose it as a contingent claim on the three bankruptcy schedules he had previously filed with this court’s bankruptcy division. Thus, Plaintiff asserted a position with this court — that he possessed a viable claim against Defendant — -that was irreconcilably inconsistent with his failure to disclose the existence of this claim before the bankruptcy court. As such, this court finds that Plaintiffs conduct meets the first prong of the judicial estoppel test.
 

 The finding that Plaintiff asserted irreconcilably inconsistent positions comports with Third Circuit precedent. In contrast to the instant case — in which Plaintiff completely failed to mention his contingent claims in any stage of the bankruptcy proceedings — the Third Circuit in
 
 Krystal
 
 found that the first prong of the judicial estoppel test was met when the plaintiff merely failed to adequately characterize his contingent claims.
 

 Krystal
 
 involved a plaintiff former car dealership, named Krystal, whose franchise agreement was in the process of being terminated by General Motors, the franchisor. Krystal, however, believed
 
 *DCCLIV
 
 that General Motors’ attempted termination was unlawful and pursued that claim in state court. It also filed for bankruptcy, after which time the termination became effected. In its disclosure statement in bankruptcy court, Krystal revealed that it was involved in state court proceedings with General Motors and referenced its position that, because the franchisor had unlawfully terminated the agreement, the franchise constituted part of the bankruptcy estate. Subsequently, Krystal brought suit against General Motors in this district, alleging that the termination violated the bankruptcy court’s automatic stay. The case was then transferred to the Middle District of Pennsylvania, which held that the plaintiffs claims were barred by judicial estoppel.
 
 Krystal,
 
 337 F.3d at 317-19.
 

 In affirming the Middle District on appeal, the Third Circuit found that Krystal asserted irreconcilably inconsistent positions because its disclosure statement was insufficient to notify the court of its contingent claims against General Motors for violation of the automatic stay.
 
 Id.
 
 at 321. The court explained, “[T]he language in the Amended Disclosure Statement was little more than boilerplate. It did not specify any of the claims contained in the instant complaint against GM, much less attempt to place any monetary value on them. We agree that such boilerplate language is simply not adequate to provide the level of notice required. The bankruptcy rules were clearly not intended to encourage this kind of inadequate and misleading disclosure by creating an escape hatch debtors can duck into to avoid sanctions for omitting claims once their lack of candor is discovered.”
 
 Id.
 

 Unlike in
 
 Krystal,
 
 Plaintiff in the instant case did not even fail to
 
 adequately disclose
 
 his contingent claims by employing ambiguous language in his bankruptcy filings. Instead, Plaintiff
 
 completely omitted
 
 any mention of such claims in any of his three disclosure statements. Thus, based on the holding in
 
 Krystal,
 
 Plaintiff undoubtedly asserted a position in this court that is irreconcilably inconsistent with his earlier stance in the bankruptcy proceedings.
 

 2. Plaintiff’s Bad Faith
 

 Having concluded that Plaintiffs failing to disclose his contingent claims against the Bank and subsequent filing of those claims in this court were irreconcilably inconsistent, it must next consider the second prong of the judicial estoppel test: whether Plaintiff changed his position in bad faith, or, with the intent to “play fast and loose with the court.”
 
 Montrose,
 
 243 F.3d at 779 (quoting
 
 Ryan,
 
 81 F.3d at 361). In making this determination, a court must distinguish between a change of position based on a good faith mistake, on the one hand, and an intentional self-contradiction employed as a means of misleading the court in order to obtain an unfair advantage, on the other.
 
 Ryan,
 
 81 F.3d at 362. Only the latter would support the finding of bad faith necessary to trigger the application of judicial estoppel.
 

 Although the intent to mislead cannot be inferred from the mere fact of nondisclosure,
 
 Ryan,
 
 81 F.3d at 364, courts are permitted to draw a rebuttable inference of bad faith “when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose.”
 
 Krystal,
 
 337 F.3d at 321 (citing
 
 Oneida,
 
 848 F.2d at 416-18). Here, Plaintiff not only knowingly failed to disclose his potential claim against the Bank when disclosure was mandated, but he also had compelling motivation to do so.
 

 a. Plaintiff’s Knowledge of the Claims
 

 With respect to knowledge, the Third Circuit has opined that “if the debtor has
 
 *DCCLV
 
 enough information prior to confirmation to suggest that it may have a possible cause of action, then it is a known cause of action such that it must be disclosed.”
 
 Krystal,
 
 337 F.3d at 323 (citation omitted). Here, it is undisputed that Plaintiff knew of his potential claims against the Bank before he failed to disclose them in his third bankruptcy schedule on April 24, 2003. By the time of that filing, Plaintiff would have received his copy of Mr. Nolan’s February 18, 2002 letter, in which Plaintiffs attorney cited the Pennsylvania Mortgage Satisfaction statute in support of his threat to sue the Bank. In addition, Plaintiffs April 24, 2003 filing took place at least three months after his conversation with Mr. Wyeoff, during which the Progress Bank executive advised Plaintiff that he may have a claim against Defendant for its failure to satisfy the repaid mortgages. Thus, the pleadings make plain that Plaintiff knowingly failed to disclose his contingent claim against the Bank in his third and final bankruptcy filing.
 

 Plaintiffs situation is similar to that in
 
 Oneida,
 
 in which the Third Circuit held that judicial estoppel barred a claim by the plaintiff trucking company against the defendant bank with whom the plaintiff had entered into a credit agreement. There, after the plaintiffs account had been habitually overdrawn, the bank requested that the trucking company’s owner personally guarantee his company’s debt. The owner refused, and the bank ceased to honor the company’s checks, an occurrence that allegedly harmed the company’s reputation and forced it to file for bankruptcy. Although the plaintiff made no mention of its potential claim during the ensuing bankruptcy proceeding, it subsequently commenced an action against the bank in New Jersey state court and alleged that the bank’s improper activities — including breaches of both the credit agreement and the duty of good faith — caused it to file for bankruptcy.
 
 Oneida,
 
 848 F.2d at 415-16. It was this allegation, the Third Circuit later confirmed, that supported the finding that the plaintiff had knowledge of its claim during the prior bankruptcy proceeding. The
 
 Ryan
 
 court explained, “[A]s the gravamen of Oneida’s case against the bank was that the bank’s actions were responsible for forcing Oneida into bankruptcy, it is clear that Oneida had knowledge of this potential claim at the time it filed for bankruptcy.” 81 F.3d at 363.
 

 As in
 
 Oneida,
 
 Plaintiff alleges that Defendant’s actions have caused him to file for bankruptcy. Amended Complaint (Document 25), ¶ 14 (“The actions of the Defendant have damaged the Plaintiff in that the Plaintiff has had to retain counsel to force the Defendants to satisfy the mortgage,
 
 to seek assistance in the Bankruptcy system,
 
 [and to] defend the action in foreclosure ... ”) (emphasis added). Thus, following the logic of
 
 Oneida,
 
 this allegation corroborates the undisputed facts that Plaintiff acted with the requisite knowledge in failing to disclose his contingent claim against the Bank in his third bankruptcy filing.
 

 b. Plaintiffs Motive to Conceal
 

 Plaintiff not only acted knowingly in failing to list his contingent claim against Defendant in his final bankruptcy filing, but he also possessed a strong motive to conceal that potential asset. This combination of knowledge and motive to conceal permits this court to infer that he acted in bad faith,
 
 Krystal,
 
 337 F.3d at 322, and Plaintiff has done nothing to rebut that presumption.
 
 [3]
 

 
 *DCCLVI
 
 It is an established principle of bankruptcy law that one seeking benefits under its terms must fulfill certain reciprocal duties, which include filing a “schedule of assets and liabilities ... and a statement of the debtor’s financial affairs.” 11 U.S.C. § 521(1).
 
 See also Oneida,
 
 848 F.2d at 416-17 (explaining that this duty includes an obligation that the debtor disclose any litigation likely to arise outside of the bankruptcy proceeding). Because both creditors and the court must rely heavily on these disclosure statements, a court “cannot overemphasize” the importance of the debtor’s obligation to accurately represent its financial position.
 
 Oneida,
 
 848 F.2d at 417.
 

 In
 
 Krystal,
 
 the Third Circuit found sufficient evidence of a motive to conceal on the part of a debtor who knowingly failed to list contingent claims in its bankruptcy filings in the face of this affirmative duty to disclose. There, the court found that the debtor’s owner — who was engaged both in negotiating claims with unsecured creditors and in funding the payment of claims and expenses associated with his company’s reorganization — had “every reason” to minimize the company’s assets so that creditors would conclude that they had no choice but to substantially compromise their claims and approve the debtor’s reorganization plan. 337 F.3d at 323.
 
 See also Oneida,
 
 848 F.2d at 418-19 (finding that the plaintiffs acknowledging a $7.7 million debt to the bank in its bankruptcy filing without any mention of a possible setoff, despite filing suit only seven months later, “worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect”).
 

 On the other hand, the court in
 
 Ryan
 
 found insufficient evidence of bad faith when the debtor builder’s nondisclosure of a potential product liability claim for defective wood trim against a manufacturer was offset by its omission of the corresponding claims against the debtor of homeowners affected by the defect. It explained that, “[T]he balance of assets and liabilities before the court and creditors when the reorganization plan was approved may have been unaffected by the failure to list the claims as assets.”
 
 Ryan,
 
 81 F.3d at 363
 

 Unlike in
 
 Ryan,
 
 there is no evidence in this case that Plaintiff omitted any potentially offsetting liabilities in any of his bankruptcy filings. Instead, he is better compared to the plaintiff in
 
 Krystal,
 
 whom the court found had acted in bad faith because he had “every reason” to minimize his assets during his bankruptcy proceeding in order that creditors — with whom he was negotiating — might compromise their claims. In a similar fashion, as Plaintiff here was benefitting from the protection of the bankruptcy court, his attorneys were simultaneously writing letters to creditors in attempts to persuade them to allow Plaintiff to settle his debts for less than the unpaid balances. Thus, Plaintiffs motive to conceal his assets is apparent.
 

 Perhaps most illustrative of this practice is Mr. Marcone’s September 18, 2002 letter to Washington Mutual. Therein, he explained that Plaintiff could not afford to pay his past due balance because he was indebted to a host of additional creditors. As support for this position, Mr. Marcone listed those creditors and the amount Plaintiff owed to each. Significantly, this list included the $550,000 debt to Jefferson Bank that Plaintiff has repeatedly emphasized to this court he had paid off more than two years earlier, on September 28, 2000. Although that letter was, of course,
 
 *DCCLVII
 
 outside the context of a judicial proceeding, it offers ample support for the position that Plaintiff was familiar with the process of overstating liabilities and understating assets in order to advance his own interests throughout the bankruptcy process. Both because he did so knowingly, and because he did so with a motive to conceal, this court finds that the undisputed evidence supports a finding that Plaintiff acted in bad faith.
 

 3. Appropriateness of Remedy
 

 Third, having concluded that Plaintiff asserted irreconcilably inconsistent positions and did so in bad faith, this court must determine whether it is appropriate to exercise its inherent power to sanction misconduct and apply judicial estoppel to bar Plaintiffs claims. While the Supreme Court has cautioned that “because of their very potency, inherent powers must be exercised with restraint and discretion,”
 
 Chambers v. NASCO, Inc.,
 
 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1992), it is likewise true that “the fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate.”
 
 Krystal,
 
 337 F.3d at 325. In making this determination, a court must consider (1) whether judicial estoppel is tailored to address the harm identified, and (2) whether any lesser sanction would adequately remedy the damage done by the conduct of the party to be estopped.
 
 Id.
 
 at 320 (quoting
 
 Montrose,
 
 243 F.3d at 779-80).
 

 Here, judicial estoppel is plainly tailored to address Plaintiffs bad faith misuse of the federal court system. Plaintiffs knowing failure to disclose this potential claim against Defendant throughout the proceedings in the bankruptcy division of this very court, coupled with his subsequent filing in this court, constitutes the exact type of “affront to the court’s integrity” that judicial estoppel is meant to protect.
 
 Montrose,
 
 243 F.3d at 785. As such, this court finds that the sanction of judicial estoppel is necessary to protect its own authority. While Plaintiff may have been successful in attempting to mislead creditors with respect to the extent of his indebtedness in the past, this court will not allow itself to fall victim to such tactics.
 

 In addition, this court can think of no lesser sanction that would adequately remedy the harm caused by Plaintiffs conduct. The Third Circuit has explained that alternative remedies, such as those found in the Federal Rules of Civil Procedure, should be deemed inadequate only when “they would not provide a district court with the authority to sanction all of the conduct deserving of sanction.”
 
 Id.
 
 (quoting
 
 Klein v. Stahl GMBH & Co. Maschinefabrik,
 
 185 F.3d 98, 109 (3d Cir.1999)).
 

 Although this court can find no provision in the Federal Rules that would be up to the task of adequately sanctioning all of Plaintiffs reprehensible conduct, it could decide to allow the case to move forward and force Plaintiff to distribute any damages recovered in this action among his remaining creditors. As the
 
 Krystal
 
 court found, however, such a remedy would not only undermine the integrity of the both the bankruptcy and judicial processes, but it would also “send a message that a debt- or should consider disclosing potential assets only if he is caught concealing them.” 337 F.3d at 325 (citation and quotations omitted). As such, this court finds it appropriate to exercise its discretion and apply judicial estoppel to bar all of Plaintiffs claims.
 

 C. The Pennsylvania Mortgage
 

 Even if Plaintiffs claims that Defendant failed to satisfy the Pennsylvania mortgage were not barred by judicial estoppel, the Defendant would nevertheless prevail because all such claims are either untimely or fail as a matter of law.
 

 
 *DCCLVIII
 

 1. Claims Based on Plaintiff’s 2000 Requests
 

 Plaintiffs principal contention is that Defendant’s failure to satisfy his Pennsylvania mortgage despite Plaintiffs repeated post-repayment demands violated 21 P.S. § 681, which provides that, “Any mortgagee ... having received full satisfaction and payment [of all funds due] ... shall, at the request of the mortgagor, enter satisfaction either upon the margin of the record of such mortgage recorded in the said office or by means of a satisfaction piece.” As such, Plaintiff seeks damages under 21 P.S. § 682, entitled “Fine for Neglect,” which explains that a mortgagee who fails to enter satisfaction within 45 days of a mortgagor’s request may be held liable for a sum not exceeding the amount of the mortgage. The statute further provides that this fine for failure to satisfy a mortgage applies “for every such offense.” 21 P.S. § 682.
 

 Pennsylvania’s two year statute of limitations, which governs actions for civil penalty or forfeiture, controls Plaintiffs claims under 21 P.S. § 682 for failure to satisfy a mortgage upon request. 42 Pa.C.S.A. § 5524(5).
 
 See, e.g., Valenza v. Heine,
 
 1986 WL 8728, at *1 (E.D.Pa. Aug.8, 1986) (applying two-year statute of limitations to claims brought under 21 P.S. § 682);
 
 Pantuso Motors, Inc. v. Corestates Bank, N.A.,
 
 745 A.2d 614, 618-19 (Pa.Super.Ct.1999) (same). In interpreting § 682, the Superior Court has held that each request to mark a mortgage as satisfied that is not timely complied with is actionable as a separate claim.
 
 Pantuso,
 
 745 A.2d at 618-19. As such, the two year limitations period begins to run anew whenever a mortgagor makes a request— either the initial request or a subsequent one^ — for satisfaction.
 
 [4]
 

 Id.
 
 at 619.
 

 Based upon the teaching of
 
 Pantuso,
 
 Plaintiff is time-barred from bringing against Defendant any claims that are based on requests to satisfy made prior to July 18, 2001, or, two years before Plaintiff filed his Complaint with this court in the instant action. Thus, any claims based either on Plaintiffs October 2000 conversation with Defendant’s officer Thomas Kelly, or on attorney Warren Trainor’s November 2000 letter on behalf of Plaintiff to the Bank’s counsel are untimely and, therefore, must be dismissed.
 

 
 *DCCLIX
 

 2. Claims Based on Plaintiff’s 2002 Requests
 

 Plaintiffs remaining claims that Defendant failed to satisfy the Pennsylvania mortgage are based on Plaintiffs 2002 requests for satisfaction.
 
 [5]
 
 Because Defendant complied with each such request by rendering a satisfaction piece within the 45-day window provided by the Pennsylvania Mortgage Satisfaction statute, Plaintiffs claims based on these requests fail as a matter of law.
 

 In order to prove entitlement to the fíne under 21 P.S. § 682, a plaintiff mortgagor must prove (1) that he or she has paid all sums due and owing with respect to the mortgage; (2) that he or she has requested that the' mortgagee enter satisfaction or provide a satisfaction piece; and (3) that the mortgagee failed to comply with the request within 45 days.
 
 O’Donoghue v. Laurel Sav. Ass’n,
 
 556 Pa. 349, 728 A.2d 914, 917 (1999). Here, there is no genuine issue as to the fact that Defendant timely complied with all of Plaintiffs 2002 requests for satisfaction.
 

 Plaintiffs earliest communication with Defendant in 2002 came on January 22, when title company employee Maxine Werbit called the Bank to request satisfaction of Plaintiffs mortgages. After receiving a letter to the same effect from Plaintiffs attorney, Dennis Nolan, Defendant worked with Mr. Nolan to obtain the information necessary to comply with the request, and it eventually prepared a satisfaction piece that it sent by Federal Express to the attorney’s office on March 1. Three days later, on March 4 — before the expiration of the 45 day window opened Ms. Werbit’s January 22 phone call — Mr. Nolan’s secretary, Theresa Marcone, signed for a package sent by Hudson United Bank and delivered by Federal Express. The shipping company’s records indicate that the package sent by Hudson United and that signed for by Mrs. Mar-cone had identical tracking numbers. Based on this evidence, no reasonable jury could find that Hudson United failed to comply with Plaintiffs request for satisfaction of the Pennsylvania mortgage within the statutorily mandated time frame.
 
 [6]
 

 D. The New Jersey Mortgages
 

 In addition to his Pennsylvania law claims, Plaintiff contends that Defendant’s alleged failure to satisfy the two mortgages on the New Jersey property entitles him to damages under that state’s common law. Although Plaintiffs Amended Complaint vaguely characterizes this claim as one for “Neglect,” Plaintiff apparently is seeking damages under the common law
 
 *DCCLX
 
 for slander of title.
 
 See
 
 Plaintiffs Proposed Verdict Sheet (Document 63), ¶ 23 (“As to the New Jersey property, do you find the Bank’s failure to satisfy the mortgages constituted a
 
 slander to the title
 
 of the New Jersey property?”) (emphasis added). It cannot be disputed, however, that this claim is untimely and must, therefore, be dismissed.
 

 Because jurisdiction in the instant case is based on diversity of citizenship, this court must apply the conflicts of law principles of Pennsylvania, as the forum state.
 
 Rohm & Haas Co. v. Adco Chem. Co.,
 
 689 F.2d 424, 429 (3d Cir.1982) (citing
 
 Klaxon Co. v. Stentor Elec. Mfg. Co.,
 
 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). In cases involving claims based on another state’s substantive law, Pennsylvania courts will apply whichever limitations period — between Pennsylvania’s and that of the foreign state — is shorter. 42 Pa. C.S.A. § 5521(b).
 

 In Pennsylvania, actions for slander of title are governed by a one-year statute of limitations.
 
 Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.,
 
 570 Pa. 242, 809 A.2d 243, 246 (2002). On the other hand, New Jersey courts have not definitively answered the question of which limitations period should be applied to slander of title actions. This court, however, needs not consider that question today because even assuming that the Pennsylvania limitations period is longer than that of New Jersey — in which case this court would apply the shorter New Jersey period — and applying that longer, one year period, Plaintiffs claim would still be untimely.
 

 Plaintiff requested that the Bank enter satisfaction of his repaid mortgages in October of 2000. It is undisputed that, after the Bank failed to comply with that request, some time in November 2000 Plaintiff hired an attorney, who contacted the Bank’s counsel to follow up on that request. As such, there can be no doubt that the limitations period began to run by November 2000.
 
 VU Skin,
 
 118 F.3d at 144 (limitations period begins to run when the right to institute and maintain the suit arises). By that time, Plaintiff knew of his right to institute this suit, yet he did not file his Complaint in this court until July 2003, almost three years later. As such, Plaintiffs claim under New Jersey law is untimely and must be dismissed.
 

 An appropriate Order follows.
 

 ORDER
 

 AND NOW, this 5th day of April, 2004, upon consideration of Plaintiffs Motion for Partial Summary Judgment (Document 41) and Plaintiffs Supplemental Motion for Summary Judgment (Document 51), and the responses thereto, it is ORDERED that said Motions are DENIED. Upon consideration of Defendant’s Motion for Summary Judgment (Document 37), it is hereby ORDERED that said Motion is GRANTED. It is further ORDERED that Defendant’s Motion in Limine (Document 36), Plaintiffs Motion in Limine (Document 42), Plaintiffs Renewed Motion to Extend the Time to File Statement of Undisputed Facts and Exhibits (Document 52), Defendant’s Motion to Disqualify Trial Counsel (Document 60), Defendant’s Emergency Motion to Strike Plaintiffs Motion for Summary Judgment (Document 68), Defendant’s Motion to Compel (Document 71), and Defendant’s Motion to Preclude Plaintiffs Expert Witness (Document 72) are DENIED as moot.
 

 [1]
 

 . As of this date, Plaintiff has not submitted a response to Defendant's Motion for Summary Judgment.
 

 [2]
 

 . In each of the three schedules, Schedule B, entitled "Personal Property,” instructed Plaintiff to list: "Other contingent and unliq-uidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims.”
 

 [3]
 

 . Plaintiff has had ample opportunity to respond to Defendant's judicial estoppel argument but, as of this date, has apparently chosen not to brief this issue. Although the court has not heard oral arguments on summary
 
 *DCCLVI
 
 judgment, a court need not take testimony to make a finding of bad faith where, as is the case here, the pleadings show the fact of nondisclosure plus a debtor’s obvious knowledge of the existence of an asset.
 
 Krystal,
 
 337 F.3d at 325.
 

 [4]
 

 .
 
 Pantuso
 
 involved a mortgagor who made repeated demands — beginning more than two years before the filing of suit and continuing until shortly before the time of filing — that the mortgagee enter satisfaction of the repaid mortgage. In holding that the plaintiff's claim was not barred by the statute of limitations because the mortgagor made at least one request within two years of filing suit, the Superior Court explained that "any limitation on the mortgagor’s ability to file suit for damages does not become activated until all refusals to fulfill the duty of recording satisfaction have been made, that is, until the satisfaction has actually been entered.”
 
 Pantuso,
 
 745 A.2d at 619. This language in context was clearly intended to mean that a plaintiff is not foreclosed from making additional, actionable requests until satisfaction in entered. At least one court, however, has taken this language out of context and interpreted
 
 Pantuso
 
 as holding that the statute of limitations does not begin to run on claims under 21 P.S. § 682 until after satisfaction is actually entered.
 
 See Mesne Prop., Inc. v. Penn Mut. Life Ins. Co.,
 
 2001 WL 1807888, at *2 (Pa.Com.Pl.2001). Such a construction would effectively eliminate the statute of limitations, as a mortgagor who allegedly made verbal requests to satisfy decades ago would be permitted to come forward and file suit, despite the fact that he or she had known about the failure to satisfy throughout the intervening years. As such,
 
 Mesne
 
 is wholly inconsistent with the notion that "under Pennsylvania law, the statute of limitations begins to run at the time the right to institute and maintain the suit arises,”
 
 Beauty Time, Inc. v. VU Skin Sys., Inc.,
 
 118 F.3d 140, 144 (3d Cir.1997) (citation and quotations omitted), and this court, therefore, declines to follow its misinterpretation of
 
 Pantu-so.
 

 [5]
 

 . Defendant submits that claims based on the 2002 requests are time-barred because, under the correct view of the law, the two-year statute of limitations began to run with Plaintiff’s earliest request, made in October 2000, to satisfy the Pennsylvania mortgage. As such, Plaintiff would have had to file suit by October of 2002. This argument is premised upon the notion that the Superior Court's decision in
 
 Pantuso
 
 was wrongly decided and is not predictive of the views of the Pennsylvania Supreme Court. Because this court finds that the claims based on the 2002 requests fail as a matter of law based on Defendant’s compliance with each such request, it need not reach this issue.
 

 [6]
 

 . Plaintiff might have argued that because of the intervening circumstance of Mr. Nolan's death — and the resulting loss of his files containing the unfiled satisfaction pieces — even though Defendant had fulfilled its duty by delivering the satisfaction pieces, it was nevertheless obligated to respond within 45 days to the subsequent requests, made by Mr. Mar-cone and the title company, for replacement satisfaction pieces. The court, however, need not decide whether such a duty would arise because Defendant complied with both the August 1, 2002 and September 27, 2002 requests by providing replacement satisfaction pieces in a timely manner.